## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| SARA E. KRINSK, on behalf of herself and all others similarly situated, ) ) | CASE NO. 8:09-CV-909-T-27EAJ |
| ) | CLASS ACTION |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| SUNTRUST BANK, a Georgia Banking ) Corporation, ) | |
| ) | |
| Defendant. ) | JURY TRIAL DEMANDED |
| ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, Sara E. Krinsk, on behalf of herself and all other similarly situated Florida residents, allege as follows in her First Amended Class Action Complaint ("Complaint") based upon the investigation undertaken by her counsel. This investigation included interviews with persons with knowledge of the conduct complained of herein, a review of United States Securities and Exchange Commission ("SEC") filings, other regulatory filings, reports, advisories, press releases, and media reports about or involving SunTrust Banks, Inc., SunTrust Bank, SunTrust Mortgage, Inc., Sun Trust Investment Services, Inc., SunTrust Robinson Humphrey, Inc., Three Pillars Funding, LLC and their respective subsidiaries, operating units and wholly owned divisions thereof, and published facts relating thereto. The resulting information forms the basis for the allegations herein. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. §§1332, 1453, 1711-1715, since the amount in controversy exceeds $5 million.  In addition, jurisdiction is separately appropriate on grounds of federal question jurisdiction (28 U.S.C. § 1331) with the Court's exercise of jurisdiction over Plaintiff's state law claims appropriate pursuant to 28 U.S.C. § 1367.

2.      Plaintiff brings this action pursuant to the causes pled herein; venue is proper in this District because Defendant conducts business and/or has a direct impact in this District and a number of the wrongful acts alleged herein took place or impacted Plaintiff and members of the putative class residing within this District.  In addition, the real property securing Plaintiff's loan is located within this District.

3.      In connection with the acts alleged in this Complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone communications.

## PARTIES

4.      Plaintiff, Sara E. Krinsk ("Plaintiff" or "Krinsk"), at all times material has, and remains, a customer of Defendant SunTrust Bank.  She applied for and thereafter obtained a home equity line of credit ("HELOC") collateralized by her personal residence located in Sarasota County, Florida in accordance with SunTrust Bank's standard-form loan agreement entitled, "Access 3 Equity Line Account Agreement and Disclosure" ("ELA Agreement"), dated December 20, 2006.

2

5. Defendant SunTrust Bank ("Defendant" or "SunTrust Bank"), is a foreign corporation that as of December 31, 2007, operated 1,682 full service banking offices located primarily in Florida, Georgia, Maryland, North Carolina, South Carolina, Tennessee, Virginia, and the District of Columbia. The principal executive offices for SunTrust Bank are currently located in Atlanta, Georgia. However, SunTrust Bank also maintains offices in Orlando, Florida that have direct responsibility for the administration of HELOC accounts originated for the benefit of Plaintiff and other members of the putative class.

## FACTUAL BACKGROUND

### A. THE RISE OF SUNTRUST BANK'S FINANCIAL WOES

6. This is a class action lawsuit arising out of Defendant SunTrust Bank's scheme, devised in early 2008, to systematically suspend and/or reduce the available credit balance on HELOCs previously issued to Florida residents (such as Plaintiff and other class members) in direct breach of its respective ELA Agreements and in violation of state and federal law.

7. The purpose and intended result of SunTrust Bank's scheme and systematic practices was the liquidation of one of the highest rated risk elements of Defendant's loan portfolio: HELOCs sold to Florida residents during the late 1990's through early 2008 that were secured by a mortgage on the borrower's Florida real property. Defendant's actions came on the heal of a devastating decline in Defendant's capital position relative to increasing federal banking oversight and regulation. SunTrust Bank carried out this scheme by creating pretextual reasons under the guise of conducting an "annual review" of customer's HELOCs to purportedly justify suspension and/or reduction (as opposed to a default of termination).

3

8.      More specifically, broad based financial deterioration at SunTrust was increasingly apparent to Defendant from, at least, its fourth quarter of calendar 2007 from, *inter alia*, its trend analysis and assessment of the credit risk imbedded in its asset base. "Credit risk," represents the maximum accounting loss that would be recognized as of a given reporting date if borrower(s) failed to perform as contracted and any collateral or security proved to be of limited value. Concentrations of credit risk that arise from financial instruments exist in relation to individual borrowers or groups of borrowers, certain types of collateral or types of industry, certain loan products, or certain regions of the country. Credit risk related to those concentrations arises when a significant volume of loans, related by common characteristics, are simultaneously impacted by changes in economic conditions (or other extreme conditions) that cause their probability of repayment to be problematic.

9.      By the end of 2007, SunTrust Bank, and its publicly traded parent company, SunTrust Banks, Inc. ("STI") recognized that there existed a significant concentration of credit risk arising from loans it issued secured by residential real estate. By June 30, 2008, SunTrust Bank owned $48.2 billion in residential real estate loans and HELOCs. This represented 38.3% of the bank's total loans, but excluded an additional $20.2 billion in SunTrust Bank's outstanding commitments to extend credit on home equity lines (and a further $11.8 billion in mortgage loan commitments). As of June 30, 2008, the loans referenced above included $16.7 billion of "interest only" loans owned by SunTrust Bank, most with a ten year "interest only" payment period. Further, approximately $1.6 billion of these loans had a combined original loan to value ratio exceeding 80%. *Ergo*, hypothetically, Defendant's elimination of its home equity line of

4

credit if weighted at 50%, for example, would save SunTrust Bank over $10 billion of capital reserves. In short, Defendant was a troubled bank and took drastic measures to address its financial health.

10. The deterioration of SunTrust Bank's financial condition was accelerated by mortgage backed securities and related residential interests on Defendant's books falling victim to declining values resulting from significant increases in default rates, while experiencing problematic recourse to the underlying collateral of Defendant's borrower base. "Tier I" and "Total Capital," are principle indicators of the financial health of banking institutions as used by the Federal Reserve, SunTrust's primary banking regulator, and essentially are a reflection of capital adequacy. Tier I capital is core capital, meaning equity capital and reserves, the financial capital considered the most reliable and liquid. "Capital," at banking institutions provides protection against unexpected losses. Specifically, Tier I Capital, is a measure of capital adequacy of a bank, and is the ratio of a bank's core equity capital to its risk-weighed assets. "Risk weighed assets," is the total of all assets held by the bank which are weighed for credit risk according to a formula determined by the regulator. The Federal Reserve allows the "BIS" – Bank of International Settlements – guidelines in setting asset risk weights. Assets like cash and coins usually have zero risk weight, while unsecured loans might have a risk weight of 100%. Thus, the greater SunTrust Bank's outstanding equity line commitments the lower its capital ratios. Indeed, notwithstanding SunTrust Bank's meteoric increase in the quantity of HELOC loans it had issued since the late 1990's, these transactions proved to be a capital reserve burden rather than benefit. This is because of the fact that since SunTrust Bank's HELOC loans are

5

primarily non-agency residential mortgage loans held for investment or loans held for sale, there is little or no observable opportunity for their trading in either the new issuance or secondary loan markets.

11.     As a result, SunTrust Bank began employing alternative valuation methodologies to determine the fair value of its HELOC portfolio and other loans, but to little avail. To rectify this situation, in mid-2008, Defendant SunTrust Bank implemented a scheme designed to fortify its Tier I (and Total) Capital to stave-off federal banking regulatory action as well as a decline of the price of its publicly traded stock by decreasing its HELOC lending obligation exposure.

12.     This scheme was accomplished through the means of letters issued by SunTrust Bank to HELOC customers through the U.S. Mail that initially (and innocuously) requested the customer to provide updated financial information. Thereafter, follow up letters issued by SunTrust Bank informed customers that Defendant had concluded either from a review of such financial information or the value of the real property securing the HELOC (as determined through an automated valuation model ("AVM") developed either by SunTrust Bank or a third party vendor) or because of an inadequate response to the request for updated financial information that the customer's HELOC lacked adequate security, *i.e.*, that the customer either made too little money to make the monthly HELOC payments necessary to satisfy any further draws on the credit line during the HELOC's Draw Period, or that the value of the customer's real property security had materially declined due to adverse market conditions. In either situation, however, SunTrust Bank's analysis and decision on the creditworthiness of its HELOC borrowers and/or the adequacy of their real property security was contrived, unreasonable and

6

performed in bad faith with the goal of wrongfully reducing Defendant's contractual exposure to future HELOC draws under its existing ELA Agreements.

13.     To address an anticipated decline of its capital ratios, SunTrust Bank implemented a scheme at Plaintiff's and class members' expense.  The scheme, a calculated response to its fiscal deterioration and adverse continuing financial conditions anticipated throughout SunTrust Bank's lending "footprint" (indicating continuing economic deterioration) was prompted by concern that unfolding events could cause ruin to the Bank.  SunTrust Bank determined (along with other measures referred to hereafter) that an easy way to show a healthier capital ratio than what truly existed would be to suspend and/or greatly reduce its lending exposure on existing HELOCs under the auspices of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, as implemented by Regulation Z, 12 CFR Part 226.

**B.     THE ELA AGREEMENT'S STANDARDIZED PROVISIONS**

14.     The pertinent terms and conditions of SunTrust Bank's standard-form ELA Agreement entered into by and between Defendant and Plaintiff (and for each member of the class), included the following:

> Promise to Pay.   You promise to pay SunTrust Bank (Sun Trust Bank, its successors and assigns, in addition to the terms referenced above, may be referred to as "Bank" herein), or order the total of all credit advances ("Advances") and **FINANCE CHARGES**, together with all costs and expenses for which you are responsible under this Agreement and/or under the security instrument ("Security Deed") which secures your Credit Line.  You will pay your credit line according to the payment terms set forth below.  **If there is more than one Borrower, each is jointly and severally liable on this Agreement.  This means, we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to the Borrower.     Each Borrower authorizes any other Borrower, on his or her signature alone, to suspend, cancel or terminate the Credit Line, to request and receive credit Advances, and to do all other things necessary to carry out the terms of this Agreement.   We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.**

7

*See* Plaintiff's SunTrust Bank ELA Agreement attached hereto as Exhibit A and incorporated

herein by reference (emphasis in original).  The terms and provisions of the standard-form ELA

Agreement executed by Plaintiff are equally applicable to all other class members.

     15.     SunTrust Bank's standard-form ELA Agreement also included the following:

**Term.**  The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue as follows: The Account establishes a line of credit upon which Borrower may request Advances for a period of (10) years ("the Draw Period"), each Advance to be repaid under one of the three options described herein ("Option 1 Advances", or "Option 2 Advances" or "Option 3 Advances").  The Account shall be payable in full no later than twenty (20) years from the date of execution of this Agreement (the "Maturity"), the last ten (10) years before Maturity being the full and final repayment period of Option 1 Advances and Option 2 Advances ("Repayment Period").  The Bank in its sole discretion may extend the Draw Period.  If the Draw Period is extended, Borrower shall be notified and the Repayment Period shall be shortened by the same period of time that the Draw Period is extended.

Accordingly, the ELA Agreement provided that the length of time for Plaintiff and the

class to draw on their credit line was a set term, at least ten (10) years.

     16.     The terms and conditions of a standard-form SunTrust Bank ELA Agreement

further included the following:

**Annual Percentage Rates and Terms During the Draw Period.**  The **ANNUAL PERCENTAGE RATE** on Option 1and Option 2 Advances shall be calculated at a rate equal to *The Wall Street Journal* Prime Rate **+ 0.000%**.  The maximum **ANNUAL PERCENTAGE RATE** for Option 1 and Option 2 Advances will not exceed **18%** per annum.  During the Draw Period, Option 1 and 2 Advances have a variable rate of interest and the **ANNUAL PERCENTAGE RATE** can change as a result.

          \* \* \*

During the Draw Period, by the payment due date shown on the monthly statement ("the Periodic Statement"), Borrower agrees to pay monthly either (i) the total amount owing as shown on the Periodic Statement) the "New Balance"or (ii) any portion of the New Balance so long as Borrower pays at least a "Minimum Payment" which is the sum of the minimum payments for each of the three (3) Options as specifically set forth below, plus any applicable insurance premiums, debt cancellations or suspension charges, late charges, and/or miscellaneous fees

as set forth on the Periodic Statement. In addition, if the New Balance exceeds the Credit Limit, Borrower will pay the amount indicated on the Periodic Statement, to reduce the Account balance to within the Credit Limit. All payments must be made in United States dollars and must be drawn on a financial institution located in the United States.

* * *

**Option 2** - Interest Only

During the Draw Period, the minimum monthly payment due for the funds advanced under this Option shall be the accrued interest on the balances for Option 2. Minimum payments made on balances under this Option will not result in any reduction of the principle balance.

Accordingly, as provided by the ELA Agreement, Plaintiff's monthly payments would be

"Interest Only" with the amount of interest calculated by reference to the prime rate of the *Wall Street Journal*.

17.   The terms and conditions of SunTrust Bank's standard-form ELA Agreement also included the following provisions:

**ANNUAL PERCENTAGE RATES AND PAYMENT TERMS DURING THE REPAYMENT PERIOD**

The **ANNUAL PERCENTAGE RATE** for the Repayment Period for Option 1 and Option 2 Advances shall be fixed on the last day of the Draw Period based on the *Wall Street Journal* Prime Rate in effect on that day, plus the margin disclosed above for Option 1 and Option 2 Advances. The term during the Repayment Period for the full repayment of the outstanding Option 1 and 2 balances will be ten (10) years. The monthly payment amount for repayment of Option 1 and 2 will be established using a straight ten (10) year amortization and will be based upon the balances, the fixed interest rate and the ten (10) year term. All amounts of Options 1 and 2 Advance balances not paid as of the end of the Draw Period will be paid according to the terms applicable to the Repayment Period.

* * *

**Credit Limit.**  This Agreement covers a revolving line of credit for the principle amount of Five Hundred Thousand & 00/100 Dollars ($500,000.00), which will be your "Credit Limit" under this Agreement. **During the Draw Period we will honor your request for credit advances subject to the section below the Lender's Rights.** You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. We reserve the right to pay or return any requested Advance that exceeds your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit line Account exceeds your Credit Limit, even if we have not yet billed you.

9

* * *

**Collateral.** You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein: a Mortgage dated December 20, 2006, to us on real property located in SARASOTA County, State of Florida. The collateral must be your primary or secondary residence.

* * *

**Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period. No matter what else may be stated in any other provision of this Agreement or in any other document you may have with us, you do not agree or intend to pay, and we do not agree or intend to charge any interest or fee for the ACCESS 3 EQUITY LINE ACCOUNT AGREEMENT AND DISCLOSURE STATEMENT which would in any way cause us to contract for, charge or collect more for the Credit Line Account than the maximum we would be permitted to charge or collect by any applicable federal or Florida state law. Any such excess interest or unauthorized fee will be applied first to reduce the unpaid principle balance of the Credit Line Account, and when the principle has been paid in full, be refunded to you.**

**For Option 1 and 2, the current Daily Periodic Rate is 0.02260% and the corresponding ANNUAL PERCENTAGE RATE is 8.25000%.** These rates are based upon the prime rate of **8.250000%** which was in effect as of 12-18-2006.

(Emphasis added).

18.     In addition, the terms and conditions of SunTrust Bank's standard-form ELA

Agreement included the following provisions:

**Lenders Rights.** Under this Agreement, we have the following rights:
**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste, or destructive use of the dwelling, failure to pay taxes, death of any persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, the use of funds or the dwelling for prohibited purposes, or if title to the property is taken through eminent domain. These are each considered events of default.

**Default Remedies.** Upon default, we may exercise any and all rights contained in this Agreement, the Security Instrument or any other rights provided to us by laws

or equity, including but not limited to, the right to sell the Real Property at public auction or as provided by law. We may waive or decline to enforce any of our rights under this Agreement at any time without affecting any of our other rights under this Agreement. Furthermore, upon default, your authorization to initiate Advances on the Account shall terminate and we may return any Access 3 Checks unpaid or decline Access 3 Credit Card charges or cash advances, without liability to you and without prior notification.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

(4) We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

(7) We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum **ANNUAL PERCENTAGE RATE** under your Credit Line Account is reached.

At no relevant time did Plaintiff or class members act in a manner as specified above that

would legally permit SunTrust Bank to suspend and/or reduce or otherwise terminate the

11

HELOC obtained by them. Rather, Plaintiff and class members satisfactorily performed all terms and conditions, such that SunTrust Bank could not "suspend" or "reduce" or otherwise unilaterally impair the HELOC's credit limit.

19.    At all times, Plaintiff's and the class members' performance under their SunTrust Bank HELOC was secured by Defendant's standard-form "Mortgage For Use With Secured Revolving Credit Agreement" (the "Mortgage"). The Mortgage secured the indebtedness of Plaintiff and class members for credit advances by them during the Draw Period pursuant to the corresponding ELA Agreement. The Mortgage described the events constituting a default by Plaintiff and the class under the ELA Agreement (there being no definition of "default" or "events of default" in the ELA Agreement itself) specifying, as follows:

**Events of Default.** Grantor will be in default under this Mortgage if any of the following happen: (A) Grantor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Grantor's income, assets, liabilities, or any other aspects of Grantor's financial condition. (B) Grantor does not meet the repayment terms of the Credit Agreement. (C) Grantor's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

*See* Exhibit B attached hereto which is a true and correct copy of Plaintiff's Mortgage and which is incorporated by this reference herein. The terms and provisions of the standard-form Mortgage executed by Plaintiff are equally applicable to all other class members.

20.    At no time were Plaintiff or class members in violation of any of the described circumstances above that would constitute a default. For example, Plaintiff and each member of the class honored all repayment terms and took no actions adversely affecting SunTrust Bank's

12

collateral for the HELOC. Indeed, at no time during the period when SunTrust Bank reduced the HELOC for Plaintiff or other class members did the value of their respective real property decline to an amount "significantly less than the original appraised value of the dwelling." 15 U.S.C. § 1647(c)(2)(B); 12 C.F.R. § 226.5b(f)(3)(vi)(A).

21. Plaintiff and the members of the class satisfactorily performed all obligations and satisfied all terms and conditions required of them pursuant to SunTrust Bank's standard-form ELA Agreement and Mortgage, except as such terms and conditions were waived, were unenforceable, were grossly unreasonable under the circumstances, or were otherwise not required by Plaintiff and the class members. For example, Plaintiff and the class were always timely of all payments owing, were never in arrears, never disputed the charges assessed, if any, by Defendant, always paid the correct amount in the proper currency, maintained the underlying collateral in exemplary condition, and were never otherwise apprised by SunTrust Bank of any deficiency in their performance pursuant to the ELA Agreement or informed that the ELA Agreement had been disregarded, violated or breached in any regard by them.

22. At all times relevant to Plaintiff and the class, SunTrust Bank's plan to fortify capital reserves included, *inter alia*, liquidating legal, outstanding lending commitments regardless of SunTrust Bank's authority to act in such a manner or the legality of doing so.

23. Plaintiff and class members learned they were the targets of SunTrust Bank's prevarications and deceit through receipt of a mailed letter (without forewarning notice, alert, caution or any earlier indication by SunTrust Bank of any improper action or condition justifying its practices) informing them that they were in default, *ergo*, had materially breached the ELA

13

Agreement, or that the property securing their HELOC had declined significantly below the dwelling's appraised value, when it was untrue and baseless. SunTrust Bank justified its actions, fatally, by referring to a remote provisional (or tangential event) speciously characterized by SunTrust Bank as justification for repudiating Plaintiff's and the class members' credit. In actuality, the suspension and/or unilateral reduction of the available account balance of their SunTrust Bank HELOCs was pretextual, not permitted by law or by the contract terms, and operated as a repudiation and breach of the ELA Agreements by Defendant.

24.    At all relevant times SunTrust Bank knew (or was grossly negligent in not knowing) that its activities were improper and were part of a scheme designed to target persons owed SunTrust Bank's performance. In proceeding in this manner, SunTrust Bank knew its actions contravened its obligations to act in good faith and exemplify fair dealing with Plaintiff and the class.

## C.    THE APPLICATION OF TILA/REGULATION Z

25.    Regulation Z promulgated under TILA generally prohibits lenders from *terminating* a HELOC before the scheduled expiration of the plan except where (a) there is fraud or material misrepresentation by the consumer in connection with the plan; (b) the consumer fails to meet the repayment terms of the agreement for any outstanding balance; or (c) any action or inaction by the consumer adversely affects the creditor's security for the plan, or any right of the creditor in such security.  12 C.F.R. § 226.5b(f)(2)(i)-(iii).

26.    Similarly, Regulation Z prohibits lenders from *suspending or reducing* a HELOC except in a few specified circumstances detailed in 12 C.F.R. Part 226. For instance, if the

14

creditor reasonably believes that a consumer will be unable to fulfill his/her repayment obligations under the plan because of a material change in financial circumstances, a HELOC suspension or reduction may be appropriate. 12 C.F.R. § 226.5b(f)(3)(vi)(B). This exception requires *both* a material change in the consumer's financial circumstances *and* a reasonable belief on the part of the creditor that, as a result of this change, the consumer will be unable to fulfill his/her payment obligations under the plan. 12 C.F.R. pt. 226, Supp. I, commentary to paragraph 226.5b(f)(3)(vi), comment 7.

27. In addition, Regulation Z permits suspension or reduction only where the value of the dwelling that secures the HELOC declines significantly below the dwelling's appraised value. 12 C.F.R. § 226.5(b)(f)(3)(vi)(A). A decline is considered significant if the initial difference between the credit limit and the available equity decreases by more than fifty percent (50%). 12 C.F.R. pt. 226, Supp. I, commentary to paragraph 226.5b(f)(3)(vi), comment 6. Regulation Z requires any suspension or reduction of a HELOC to be based on an assessment of the value of each dwelling that secures the plan. 12 C.F.R. § 226.5b(f)(3)(vi)(A); 12 C.F.R. pt. 226, Supp. I, commentary to paragraph 226.5b(f)(3)(vi), comment 6. Federal guidelines interpreting Regulation Z and TILA require that banks have a sound factual basis for determining that a property experienced a significant decline in value.

28. Likewise, banks may suspend or reduce a HELOC pursuant to Regulation Z if the consumer is in default of any material obligation under the HELOC agreement. 12 C.F.R. § 226.5b(f)(3)(vi)(C).

15

29.     In breach of TILA/Regulation Z and the ELA Agreements of Plaintiff and all other members of the class, SunTrust Bank improperly suspended and/or materially reduced the available account balance of its customer's HELOCs. In fact, Defendant had no such legal right as it represented and, instead, was contractually prohibited from acting in the manner it did to Plaintiff and the class, and exploited the justification for its request while in reality a pretext intended to avoid the burgeoning need for additional capital by erasing legal obligations.

## EVENTS PERTAINING TO PLAINTIFF AND THE CLASS

30.     On or about December 20, 2006, Plaintiff entered into a contract with SunTrust Bank which, like all class members, was denominated by the ELA Agreement that provided Plaintiff with a $500,000 HELOC. The terms and conditions of the ELA Agreement were common and typical as to each member of the putative Class. The ELA Agreement provided Plaintiff with the right to draw on the credit line while making "interest only" repayments (one of three repayment options) until the end of the term governing the ELA Agreement. SunTrust Bank's contract (*i.e.*, the HELOC) was fully secured by a first mortgage on Plaintiff's home in Longboat Key, Florida. The property had been appraised by SunTrust Bank in connection with the HELOC, at approximately $1.5 to $1.6 million (*i.e.*, over three times the amount of the available Credit Limit for Plaintiff under the ELA Agreement).

31.     In fact, an appraisal (for flood insurance) just weeks prior to the execution of the ELA Agreement indicated a decline in prospective market price of less than $300,000 - its appraised value still exceeding $1.2 million! Thus the adequacy of SunTrust Bank's collateral was never an issue (nor reasonably could it be) concerning SunTrust Bank's conduct as

16

complained of hereby.

32. Consistent with other class members, on October 3, 2008, Plaintiff received a letter from SunTrust Bank requesting updated financial information as part of its "equity line account review process," and demanded receipt of the requested information within two weeks of the date of the letter (September 29, 2008). The letter failed to disclose that its true purpose was to reassess Plaintiff's access to her HELOC, and its general and vague language failed to alert Plaintiff of the potential consequence of providing an unsuitable response and/or failing to return the information within the two week time period mandated by Defendant.

33. Plaintiff's HELOC pursuant to the ELA Agreement became effective in late December 2006, and the SunTrust Bank letter was the first (and only) request for "updated" financial or other information or data of any kind that had been received by Plaintiff. There was nothing in the SunTrust Bank letter alerting Plaintiff that the requested information demanded was going to be used by SunTrust Bank to "reassess" Plaintiff's continuing entitlement to her HELOC.

34. Despite great inconvenience and expense, Plaintiff secured and provided the financial information requested by SunTrust Bank in a timely fashion. Notwithstanding having done so, Plaintiff thereafter received a SunTrust Bank letter dated October 17, 2008, informing her that "access to additional credit under [her] Equity Line Agreement" was suspended "effective October 16, 2008." (*See* SunTrust October 17, 2008 letter attached as Exhibit C).

35. At the time of SunTrust Bank's unilateral suspension of Plaintiff's $500,000 equity line of credit, she had withdrawn less than $100,000 from the HELOC.

17

36.     In actuality, Plaintiff's and class members' financial circumstances (including credit worthiness) had not materially changed since the time their HELOCs were originally underwritten and approved by SunTrust Bank. Further, because Plaintiff and the members of the class satisfactorily performed all things and satisfied all terms and conditions required of them pursuant to the standard-form ELA Agreement and Mortgage, were always timely of all payments owing, were never in arrears, never disputed the charges assessed, if any, by SunTrust Bank, and always paid the correct amount in the proper currency, Defendant did not have a reasonable belief that - as a result of any purported material change in financial circumstances - Plaintiff and class members would be unable to fulfill their payment obligations.

37.     The ELA Agreement did not permit SunTrust Bank to suspend and/or reduce Plaintiff's and class members' HELOCs based on the facts as aforedescribed. The provision of the standard-form ELA Agreement allowing SunTrust Bank to obtain updated financial information (*i.e.*, Annual Review) did not provide criteria for or legally allow suspension or reduction of credit without notice, procedure or forewarning. No part of the ELA Agreement indicated that Plaintiff's activities or similar activities or specified valuation criteria would result in suspension or reduction of Plaintiff's and the class' credit lines.

38.     Further, at no time during the class period did the value of Plaintiff's or other class members' real property securing the HELOC decline to an amount "significantly less than the original appraised value of the dwelling." 15 U.S.C. § 1647(c)(2)(B); 12 C.F.R. § 226.5b(f)(3)(vi)(A).

18

39.     SunTrust Bank suspended or materially reduced Plaintiff's and the class members' HELOCs without first reasonably assessing the value of the affected property, or otherwise having a sound factual basis for determining that the relevant property experienced a significant decline in value. Defendant knowingly and intentionally used faulty and dubious automated formulas, with unreliable and inaccurate analyses, formulas, equations and processes vulnerable to manipulation, including but not limited to AVMs, to unreasonably undervalue the real property security provided by Plaintiff and class members for their HELOCs so as to falsely trigger Defendant's purported "right" to freeze or lower their HELOC credit limits.    SunTrust Bank used the rigged AVM's to justify suspending or reducing those accounts that were part of its riskiest HELOC portfolio (*i.e.*, those sold to Florida residents secured by a mortgage on the borrowers' Florida residence), without assessing the value of the collateral that secured each affected HELOC account.    In effect, SunTrust Bank has repudiated these HELOCs in direct violation and breach of the ELA Agreement and TILA (Regulation Z).

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a "Class" consisting of:

All Florida residents who entered into one or more agreements for a home equity line of credit (HELOC) with SunTrust Bank pursuant to its "Access 3 Equity Line Account Agreement and Disclosure" that was collateralized by real estate located in Florida, and who had the available balance of their HELOC suspended or reduced anytime between January 1, 2007 to the date of class certification (the "Class Period.")

41.     Members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time

19

and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members of the Class located throughout Florida. Throughout the Class Period, SunTrust Bank conducted the improper activities complained of herein in a consistent and systematic fashion throughout Florida. Members of the Class may be easily identified from HELOC records maintained by SunTrust Bank and or its subsidiaries, divisions or agent(s), and all Class members can be notified of the pendency of this action by mail and publication, using forms of notice similar to those customarily used in class action consumer lawsuits.

42.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class had previously applied for and obtained a HELOC from SunTrust Bank pursuant to a standard-form ELA Agreement, and have sustained damages as a result of Defendant's unlawful and/or improper activities as alleged herein. Plaintiff has retained counsel competent and experienced in class and consumer litigation and intends to vigorously prosecute this action. The interests of the Class will be fairly and adequately protected by Plaintiff. Plaintiff has no interests which are contrary to or in conflict with those of the Class which Plaintiff seeks to represent.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action. Much of the information needed for administrative purposes relative to identity of the Class and calculation of damages are available from Defendant through its computerized records.

44.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Questions of

law and fact common to the Class include:

> A.     Whether SunTrust Bank deployed a scheme or artifice to deceive and engaged in a common course of business which acted to deceive or mislead Plaintiff and members of the Class;
>
> B.     Whether SunTrust Bank's internal policies and procedures, existing at the time of Plaintiff' and Class members' ELA Agreements, incorporated a plan to create and rely on pretextual reasons to suspend and/or reduce HELOC obligations owing to Plaintiff and Class members, in the event it was necessary to bolster SunTrust Bank's financial condition;
>
> C.     Whether SunTrust Bank engaged in deceptive and misleading acts and practices in the sale of its HELOCs to Plaintiff and other Class members;
>
> D.     Whether SunTrust Bank breached the terms of its standard-form ELA Agreements and/or Mortgages by suspending or reducing the available HELOC account balances of its customers, including Plaintiff and the Class, as complained of herein;
>
> E.     Whether SunTrust Bank breached its implied covenant of good faith and fair dealing in its standard-form ELA Agreements and/or Mortgages by suspending or reducing the available HELOC account balances of its customers, including Plaintiff and the Class as complained of herein;
>
> F.     Whether the laws of the State of Florida were violated by SunTrust Bank as a result of its usage of deceptive and misleading advertisements and standard-form home equity mortgage agreements as alleged herein;
>
> G.     Whether the Plaintiff and members of the Class are entitled to specific performance, injunctive relief, restitution, disgorgement or other equitable relief against SunTrust Bank; and
>
> H.     Whether Plaintiff and members of the Class have sustained damages as a result of Sun Trust Bank's wrongful conduct and, if so, what is the proper measure of such damages.

45.     The claims asserted by Plaintiff are typical and consistent with the claims of the

members of the Class.

46.     The Plaintiff will fairly and adequately protect the interests of the Class, and the

Plaintiff has retained attorneys experienced in class and complex litigation as counsel.

47.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy for at least the following reasons:

>       A.      Given the limited resources of Class members, the complexity of the
>       issues involved in this action, and the size of individual Class members' claims,
>       few, if any, Class members could afford to seek legal redress individually for the
>       wrongs SunTrust Bank committed against them;
>
>       B.      When the liability of SunTrust Bank has been adjudicated, claims of all
>       members of the Class can be determined by the Court;
>
>       C.      This action will cause an orderly and expeditious administration of the
>       Class claims, economies of time, effort and expense will be fostered, and
>       uniformity of decisions will be insured;
>
>       D.      Without a class action, the Class members will continue to suffer damages
>       and SunTrust Bank's violations of law will proceed without remedy while
>       SunTrust Bank continues to reap and retain the proceeds of its wrongful conduct;
>       and
>
>       E.      This action presents no difficulties that would impede its management by
>       the Court as a class action.

## COUNT ONE
### (Breach of Contract)

48.     Plaintiff and the Class re-allege all paragraphs 1 through 47 of the Complaint as if

set out in full herein.

49.     Plaintiff and the Class entered into standard-form ELA Agreements and

Mortgages with SunTrust in conjunction with the application and obtaining of a SunTrust

HELOC.

50.     In accordance with the ELA Agreement, Plaintiff and the Class were each

uniformly provided a line of credit (the "Credit Line") which allowed Plaintiff and the Class to

draw against their Credit Line (the "Advance") for a set period of time (normally ten (10) years)

22

(called the "Draw Period") with each Advance paid in full pursuant to one of three standard-form payment options, within a time period normally twenty (20) years from execution of the ELA Agreement.

51.     The ELA Agreement provided that Plaintiff and the Class could draw an Advance up to their available Credit Limit on an aggregated basis (*i.e.*, the Credit Limit minus the sum of all unpaid Advances.)

52.     The ELA Agreement was substantially identical for Plaintiff and the Class excepting that the ELA Agreement provided (three) alternative methods of repayment of the Advances. The three options (and hence the name "Option 3 Equity Line Account Agreement") provided alternative methods for repayment of the equity line. One option was denominated as a Revolving Line of Credit (referred to in the ELA Agreement "Option 1") an Interest Only payment schedule was another option (referred to in the ELA Agreement as "Option 2") and a Fixed Rate/Fixed Term was the last option (referred to in the ELA Agreement as "Option 3").

53.     At no time were Plaintiff and the Class in violation of any terms or conditions of the ELA Agreement and were never in default of any payment obligation or other material provision of the ELA Agreement and were never provided notice otherwise as would be relevant to this lawsuit.

54.     Notwithstanding the contract between Plaintiff and the Class on the one hand and SunTrust Bank on the other, Defendant without right and in disregard of the law, informed Plaintiff and the Class that their HELOCs would nevertheless be suspended, materially reduced or otherwise made unavailable as previously promised.

23

55.     No contract terms and/or provisions of the ELA Agreement allowed Defendant to act as herein described.

Plaintiff and the Class have suffered economic loss, cost, injury and expense as a result of SunTrust Bank's disregard of the ELA Agreement for which SunTrust Bank is liable.

## COUNT TWO

### (Violation of Regulation Z of TILA)
### (12 C.F.R. § 226.5b(f) *et. seq.*)

56.     Plaintiff and the Class re-allege paragraphs 1 through 47 of the Complaint as if set out in full herein.

57.     Regulation Z, 12 C.F.R. Part 226, is a legal requirement implementing the TILA, that prescribes standards of conduct by which a home equity line of credit as existed for Plaintiff and the Class pursuant to the ELA Agreement, may be terminated, suspended, or reduced by SunTrust Bank. Pursuant to Regulation Z, SunTrust Bank and its subsidiaries and/or agents may prohibit additional extensions of credit or reduce a borrowers' (like Plaintiff and the Class members) credit limit only pursuant to a limited number of specific circumstances.

58.     Regulation Z generally prohibits lenders from *terminating* a HELOC before the scheduled expiration of the plan except where (a) there is fraud or material misrepresentation by the consumer in connection with the plan; (b) the consumer fails to meet the repayment terms of the agreement for any outstanding balance; or (c) any action or inaction by the consumer adversely affects the creditor's security for the plan, or any right of the creditor in such security. 12 C.F.R. § 226.5b(f)(2)(i)-(iii).

24

59. Similarly, Regulation Z prohibits lenders from *suspending or reducing* a HELOC except in a few specified circumstances. For instance, if the creditor reasonably believes that a consumer will be unable to fulfill his/her repayment obligations under the plan because of a material change in financial circumstances, suspension or reduction may be appropriate. 12 C.F.R. § 226.5b(f)(3)(vi)(B). This exception requires *both* a material change in the consumer's financial circumstances *and* a reasonable belief on the part of the creditor, that as a result of this change, the consumer will be unable to fulfill his/her payment obligations under the plan. 12 C.F.R. pt. 226, Supp. I, commentary to paragraph 226.5b(f)(3)(vi), comment 7.

60. In addition, Regulation Z permits suspension or reduction only where the value of the dwelling that secures the HELOC declines significantly below the dwelling's appraised value. 12 C.F.R. § 226.5b(f)(3)(vi)(A). A decline is considered significant if the initial difference between the credit limit and the available equity decreases by more than fifty percent (50%). 12 C.F.R. pt. 226, Supp. I, commentary to paragraph 226.5b(f)(3)(vi), comment 6. Regulation Z requires any suspension or reduction of a HELOC to be based on an assessment of the value of each dwelling that secures the plan. 12 C.F.R. § 226.5b(f)(3)(vi)(A); 12 C.F.R. pt. 226, Supp. I, commentary to paragraph 226.5b(f)(3)(vi), comment 6. Federal guidelines interpreting Regulation Z and TILA require that banks have a sound factual basis for determining that a property experienced a significant decline in value.

61. Likewise, banks may suspend or reduce a HELOC pursuant to Regulation Z if the consumer is in default of any material obligation under the HELOC agreement. 12 C.F.R. § 226.5b(f)(3)(vi)(C).

25

62.     Defendant has violated TILA and Regulation Z by improperly suspending and/or reducing Plaintiff's and Class members' HELOCs through the use of pretextual reasons that lack any reasonable basis in fact, namely that Plaintiff and Class members purportedly failed to respond to a request for updated financial information and/or by using improper triggering events to determine when a materially adverse change in financial circumstances occurred.

63.     In fact, Plaintiff's and Class members' financial circumstances (including credit worthiness) had not materially changed since the time their HELOCs were underwritten and approved by SunTrust. Further, because Plaintiff and the members of the Class satisfactorily performed all things and satisfied all terms and conditions required of them pursuant to the standard-form ELA Agreement and Mortgage, were always timely of all payments owing, were never in arrears, and always paid the correct amount in the proper currency, SunTrust Bank did not have a reasonable belief that as a result of any purported material change in financial circumstances Plaintiff and Class members would be unable to fulfill their HELOC payment obligations.

64.     In addition, SunTrust Bank suspended or reduced Plaintiff's and Class members' HELOCs without first reasonably assessing the value of the affected property, or otherwise having a sound factual basis for determining that the relevant property experienced a significant decline in value. Defendant knowingly and intentionally used faulty and dubious automated formulas, with unreliable and inaccurate analyses, formulas, equations and processes vulnerable to manipulation, including but not limited to AVMs, to unreasonably undervalue Plaintiff's and Class members' homes so as to falsely trigger Defendant's right to freeze or lower the credit

26

limits. Indeed, at no time during the Class Period did the value of Plaintiff's or other Class members' real property securing the HELOC decline to an amount "significantly less than the original appraised value of the dwelling." 15 U.S.C. § 1647(c)(2)(B); 12 C.F.R. § 226.5b(f)(3)(vi)(A).

65.     Rather, SunTrust Bank used the rigged AVM's to justify suspending or reducing those accounts that were part of its riskiest HELOC portfolio (*i.e.*, those sold to Florida residents secured by a mortgage on the borrowers' Florida residence), without assessing the value of the collateral that secured each affected HELOC account.

66.     At no time were Plaintiff and the Class in violation of the ELA Agreement having maintained the underlying collateral in exemplary condition pursuant to the ELA Agreement and otherwise satisfactorily performing all things and satisfying all terms and conditions required of them pursuant to the standard-form ELA Agreement and Mortgage, including timely paying all amounts owing. At all relevant times, SunTrust Bank was not sincerely interested in ascertaining facts or receiving information pursuant to its legitimate interest in its collateral but, instead, wanted to justify the forfeiture of Plaintiff's and the Class members' HELOC obligations from SunTrust Bank to enhance the appearance of SunTrust's capital condition.

67.     In acting in the manner described above, SunTrust Bank has effectively repudiated and terminated Plaintiff's and Class members' HELOCs in direct violation of TILA and Regulation Z.

68.     Pursuant to TILA, *inter alia*, when the circumstance specified as justification for the creditor's action ceases to exist, credit privileges must be reinstated. 12 C.F.R. pt. 226, Supp.

27

I, commentary to § 226.5b(f)(3)(vi), comment 2. SunTrust Bank was responsible in accordance with Regulation Z for providing this information to Plaintiff and the Class and/or ensuring that credit terminated, suspended or reduced was restored as soon as reasonably possible after the condition described by the creditor as justification for its action ceased to exist. *Id.* at comment 4. In these instances, there were no such reasons as to Plaintiff and the Class or such reasons ceased to exist. Additionally, Regulation Z requires that SunTrust Bank is required to investigate any condition(s) concerning Plaintiff and the Class frequently enough to be certain that the purported condition justifying the termination, suspension and/or reduction of credit was factually based and applied. Alternatively, a creditor (like SunTrust Bank) may shift the duty to the consumer to request reinstatement of adverse credit activities directed at Plaintiff and the Class only upon notice of the facts to the consumer, prior to initiating adverse action against such a borrower (*i.e.*, Plaintiff and the Class).

69. As related herein, above, Plaintiff and the Class received at the most a request for "updated" financial information from Defendant which was immediately and/or inappropriately acted upon by SunTrust Bank against Plaintiff and the Class without the required notice, without the required reinstatement information and done so by Defendant as a pretext to eliminate its credit obligations. In actuality, Plaintiff's and the Class' credit was not suspended or reduced, but terminated without a realistic or the legally required opportunity for reinstatement.

70. Defendant's actions in suspending and/or reducing Plaintiff's and the Class' secured credit line pursuant to the ELA Agreement (and Mortgage) violated the procedures and requirements of TILA and Regulation Z. SunTrust Bank's disregard of the requirements of

28

Regulation Z was a necessary ruse to terminate Defendant's credit/lending obligations owing to Plaintiff and the Class to create the appearance of a stronger capital base and capital ratio for SunTrust Bank.

71. Defendant failed to act as truly required by TILA and Regulation Z by reducing and/or suspending Plaintiff's and the Class members' access to their credit lines in accordance with the ELA Agreements for purposes that were pretextual rather than material to the HELOC. SunTrust Bank calculated the best plausible excuse that could be fabricated to terminate credit obligations, including those owed Plaintiff and the Class. Defendant's violations of TILA and Regulation Z have damaged Plaintiff and the other Class members in the form of being denied the use and enjoyment of access to their bargained-for credit, returned/dishonored check fees, finance charges, annual account fees, lost interest, early termination fees and other costs and damages. Defendant is accordingly liable for at least the specified statutory amount specified for violation of TILA and Regulation Z, including those permitted under subdivisions (a)(1), (a)(2)(B) and (a)(3) of 15 U.S.C. § 1640.

## COUNT THREE
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

72. Plaintiff and the Class re-allege paragraphs 1 through 47 of the Complaint as if set out in full herein.

73. The rule is well settled in Florida that every contract includes an implied covenant of good faith and fair dealing requiring that no party to a contract will do anything which will have the effect of destroying or impairing the right(s) of the other party to receive the benefits conferred by the contract. This covenant applies to both performance and enforcement of the

29

contract and is particularly applicable to the instances described herein where one party is invested with a discretionary power affecting the rights of another and, as such, must be exercised with the greatest good faith (*see* Restatement (Second) of Contracts § 205).

74. Defendant's actions as described herein were not for a proper, permissible or legally legitimate reason permitted by the contract between Plaintiff and the Class and SunTrust Bank but, rather were intended to work a forfeiture of Plaintiff's and the Class members' bargained for consideration in derogation of their contractual rights and the money paid thereafter.

75. Defendant has accordingly violated the implied covenant of good faith and fair dealing as to Plaintiff and the Class. The terms and/or conditions of the standard-form ELA Agreement (a contract of adhesion) if any are referenced by Defendant as justification for its acts were unconscionable in that their inclusion was the result of an absence of meaningful choice on the part of Plaintiff and the Class and such terms or conditions, if any, are referenced by Defendant as justification are unreasonably favorable to SunTrust Bank and fail to be clear or meaningful as written and then exercised by Defendant (*i.e.*, unconscionable). The terms and/or conditions are procedurally infirm in this circumstance in that any such terms and/or conditions are the product of an inequality of bargaining power such that Plaintiff and the Class had no genuine power to negotiate or meaningful choice relative to their insertion in the SunTrust Bank standard-form ELA Agreement. Separately, Plaintiff and the Class acting reasonably would be surprised by the terms and/or conditions as applied by SunTrust Bank in that said supposedly agreed upon terms of the bargain and conditions to the contract are hidden in a prolix adhesion

30

contract that, with little variation among members of the Class, was drafted wholly by SunTrust Bank. SunTrust Bank uses its sophistication relative to the lack of sophistication by Plaintiff and the Class to gain advantage over consumers like Plaintiff and other Class members. Further, the terms and/or conditions of the ELA Agreement, if any, are referenced by Defendant as justification for its acts as alleged herein, would consist of an allocation of risk which is (or would be under these circumstances) overly harsh and one-sided and not justified by the circumstances in which the contract (*i.e.*, the ELA Agreement) was made between Plaintiff and the Class on the one hand and Defendant on the other. In accordance with the above, any such terms and conditions would be procedurally and substantively unconscionable and, *ergo*, unavailable to Defendant to justify its actions as herein described.

## COUNT FOUR
### (Declaratory Relief)

76.     Plaintiff and the Class re-allege paragraphs 1 through 47 of the Complaint as if set out in full herein.

77.     On or about the dates hereinabove alleged, Plaintiff entered into a transaction with SunTrust Bank to obtain a HELOC secured by the equity in real property located in Florida. Said transaction was memorialized in Defendant's standard-form ELA Agreement and Mortgage.

78.     An actual controversy has arisen and now exists between Plaintiff and SunTrust Bank in that latter has denied expressly or by their actions the full benefits of the credit line obtained by Plaintiff. While Plaintiff, on the one hand, believes that the standard-form ELA Agreement and Mortgage must afford them the bargained for credit line secured by the value of their Florida property, Defendant, on the other hand, disputes that contention and has informed

31

Plaintiff that the credit lines at issue have been unilaterally suspended and/or reduced by SunTrust Bank. More specifically, Plaintiff believes that Defendant is obligated to provide the full amount of the bargained for credit line pursuant to the terms and conditions of the parties' ELA Agreement and Mortgage.

79.     Defendant, on the other hand, denies and disputes that it is required to provide the full amount of the credit line and may unilaterally and in its sole discretion reduce the same as it has done.

80.     Plaintiff thus desires a judicial determination of her rights and those of similarly situated members of the Class under the ELA Agreement and Mortgage entered into with SunTrust Bank as described above and a declaration as to whether Defendant is obligated to fund the full amount of the credit line.

**WHEREFORE**, Plaintiff, on behalf of herself and on behalf of the members of the Class defined herein, demand judgment against Defendant as follows:

a.     Determining that the action is a proper class action and certifying a class pursuant to Fed. R. Civ. Proc. 23;

b.     Awarding Plaintiff and members of the Class compensatory damages for the wrongful acts complained of in an amount to be proven at trial, including any damages provided for by statute;

c.     Awarding Plaintiff and the Class declaratory relief, and reinstatement of their home equity lines of credit;

d.     Awarding Plaintiff and members of the Class their costs and disbursements

32

incurred in connection with this action, including reasonable attorneys' fees,

expert witness fees and other costs as permitted by law;

e.      Awarding pre-judgment and post-judgment interest; and

f.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues that may be so tried.

DATED this 28th day of January, 2010.

Respectfully submitted,

/s  Mark L. Knutson
MARK L. KNUTSON, ESQ.

JENNIFER L. MACPHERSON, ESQ.
FINKELSTEIN & KRINSK, LLP
501 West Broadway, Suite 1250
San Diego, CA  92101
Telephone:  (619) 238-1333
Facsimile:  (619) 238-5425
mlk@classactionlaw.com
jrk@classactionlaw.com
jlm@classactionlaw.com

and

JAMES A. WARDELL, ESQUIRE
TRIAL COUNSEL
WARDELL & QUEZON, P.A.
805 W. Azeele Street
Tampa, Florida 33606
Telephone:  (813) 387-3333
Facsimile:  (813) 387-3050
Florida Bar No.:  0868061
jwardell@jawlaw.net

*Attorneys for Class Plaintiff*

33

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2010, I electronically filed a true and correct copy of Plaintiff's First Amended Class Action Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

Dated: January 28, 2010        _s/ _ Mark L. Knutson_____
                                       Mark L. Knutson

34